## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

FEDERAL-MOGUL MOTORPARTS
CORPORATION, a Delaware corporation,

        Plaintiff,

Case No.:

v.

MEVOTECH L.P., a Canadian limited
partnership,

        Defendant.
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff Federal-Mogul Motorparts Corporation ("Federal-Mogul"), through its attorneys, Dickinson Wright PLLC, files this Complaint for patent infringement against Defendant Mevotech L.P. ("Mevotech"), and alleges as follows:

### I.    BACKGROUND

1. Federal-Mogul and its predecessor companies are long-standing, Michigan-based leading global manufacturers and distributors of automotive aftermarket products. Federal-Mogul has invested continuously for more than a century to design, manufacture, and sell a broad portfolio of quality automotive

1

parts, including its flagship MOOG® premium chassis brand. The MOOG® premium chassis brand is today an industry-preferred brand for steering and suspension components. Many of these MOOG® premium chassis products incorporate "moveable sockets" or "ball joints" manufactured by a method that is protected by a United States patent that is owned by Federal-Mogul that utilizes an innovative press-in cover plate.

2. On information and belief, Mevotech is a Canadian limited partnership with its principal place of business in Ontario. On information and belief, Mevotech designs, inspects, produces, manufactures, imports, markets, offers for sale, sells and distributes chassis products that incorporate moveable sockets or ball joints.

3. Recently, Federal-Mogul has learned that Mevotech, without authority, is importing into the United States, and offering to sell, selling, distributing and using within the United States, automotive chassis parts that incorporate movable sockets that are made by a process that infringes Federal-Mogul's innovative press-in cover plate patent.

4. Federal-Mogul files this lawsuit to enforce its patent rights and to obtain a judgment that Mevotech owes Federal-Mogul damages for its unlawful infringement.

## II.   NATURE OF THE CASE

5. This is a complaint for infringement of United States Patent No. 6,202,280 (hereinafter the "'280 Patent" or "Asserted Patent") under 35 U.S.C. § 271(g). The '280 Patent entitled "COVER-PLATE EXPANSION ASSEMBLY METHOD" was duly and legally issued by the United States Patent and Trademark Office on March 20, 2001 after full and fair examination.

6. Federal-Mogul is the assignee of all rights, title, and interest in the '280 Patent, including the right to recover damages for past infringement. A copy of the '280 Patent is attached as **Exhibit 1** to this Complaint.

## III.   THE PARTIES

7. Plaintiff Federal-Mogul is a Delaware corporation having a principal place of business in Southfield, Michigan.

8. On information and belief, Defendant Mevotech is a Canadian limited partnership with its principal place of business in Ontario.

## IV.   JURISDICTION AND VENUE

9. This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

10. This Court has exclusive subject matter jurisdiction over Federal-Mogul's patent infringement claim pursuant to 28 U.S.C. § 1331 and § 1338(a) because it arises under the patent laws of the United States.

11. Personal jurisdiction exists over Mevotech in this District by virtue of, *inter alia*, the fact that it conducts business activity within the State of Michigan and in this District, has substantial and continuous contacts within the State of Michigan and in this District, and has committed acts of patent infringement in the State of Michigan and in this District.

12. Mevotech's substantial contacts with the United States, the State of Michigan, and this District include:

    a. Mevotech offers to sell and sells the accused products in the United States, including in Michigan in this District, through several distributors, including Autowares;

    b. Mevotech maintains sales representatives and regional sales managers in the United States, including in Michigan (*see* Mike Dolmetsch LinkedIn profile, attached as **Exhibit 2**; Aftermarket News article, *available at* http://www.aftermarketnews.com/mevotech-sales-appointments/, attached as **Exhibit 3**; Mevotech webpage

4

        available at http://www.mevotech.com/contact/, attached as **Exhibit 4**);

   c.   Mevotech's own web page explicitly admits that its sales representatives are "serving Michigan" among other states (*see* http://www.mevotech.com/contact/, attached as Exhibit 4); and,

   d.   Mevotech directly imports, uses, offers for sale, and sells the accused products in the United States, including through its two United States distribution centers and its so-called "Mevomobile" – a truck fully-outfitted with Mevotech's chassis parts that is driven across North America, purportedly stops at service shops and sales centers whereupon the sales technician demonstrates and promotes the sale and purchase of the Mevotech products (*see* Aftermarket News article, Exhibit 3; "The Mevomobile," CarCareBusiness, May 2015, attached as **Exhibit 5**).

13.   Mevotech's contacts are sufficient to confer personal jurisdiction over it under Michigan's long-arm statute. M.C.L. § 600.711; M.C.L. § 715. Mevotech's contacts are sufficient to allow this Court to exercise either general or specific jurisdiction over Mevotech. *Id.*

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and § 1400(b) because (a) a substantial part of the events giving rise to Federal-Mogul's claim occurred in the Eastern District of Michigan, (b) Mevotech has committed acts of infringement in the Eastern District of Michigan, and (c) Mevotech has a sufficient connection with the Eastern District of Michigan to make venue proper in this district, all as alleged in this Complaint.

## V.  GENERAL ALLEGATIONS

**A.  Automotive "Ball Joints"**

15. Since its inception and continuing today, Federal-Mogul and its predecessor companies have engaged in extensive research and development of new manufacturing techniques for products in its portfolio, including automotive chassis products that incorporate one or more ball joints.

16. A ball joint is a spherical bearing that is used on virtually every vehicle on the road today. It plays a critical role in the safe operation of the suspension and steering of the vehicle because it permits free movement in various planes at the same time, as well as rotation in those planes.

17. On modern vehicles, upper and lower control arms are used to connect the wheels to the suspension via a mechanical part called a "knuckle." Combining ball joints with control arms enables motion in three planes, allowing the front end

of a vehicle to be steered while a spring and shock suspension make the ride comfortable.

18. A photograph showing a typical suspension/steering mechanism and the location of various ball joints is shown below:



**B.     The Innovative Cover-Plate Expansion Assembly Method Protected by The '280 Patent**

19.    As a pioneer in automotive chassis parts, Federal-Mogul and its predecessor companies began developing a new process for the assembly and manufacture of ball joint assemblies that would later be published in the '280 Patent to advance the state of the art.

20.    As taught in the '280 Patent, Federal-Mogul's innovative method involves a press-in cover plate closure method that includes a domed cover plate that fits into a machined groove and is pressed into the part, where it expands and securely grips the groove, sealing against the housing.  *See* Exhibit 1, '280 Patent.

21.    This patented design is illustrated in the below image taken from MOOG® Bulletin 27018-R, attached as **Exhibit 6**.



8

22. This press-in cover plate assembly and manufacturing method resulted when Federal-Mogul innovated to solve performance issues associated with the ball joints used in the industry at the time.

23. Standard ball joints prior to the invention of the '280 Patent utilized metal joint housings that necessarily were designed as a compromise between competing interests. On the one hand, the housing had to be hard enough to support the load of the stud ball. On the other hand, the housing had to be soft enough to allow the rim of the housing to be rolled over to trap the traditional cover plate within the housing. Too hard and the rim would crack when rolled over, and too soft and the joint would wear prematurely. The solution at the time was to heat treat the portion of the housing supporting the stud ball in order to leave the rim portion in an untreated soft condition.

24. The teachings of the '280 Patent provided a significant advancement in the art. The '280 Patent introduced a revolutionary new cover plate that assembled with the housing by being pressed and expanded into the housing, rather than being secured by rolling the rim of the housing over the edge of the cover plate.

25. This new press-in cover plate assembly and manufacturing method had the synergistic effect of enabling Federal-Mogul to make a further significant improvements in the housing as well. For the first time, the housing – including

the rim – could be made in a fully-hardened condition. This greatly simplified the manufacture of ball joints by eliminating the need to heat treat a portion of the housing, and improved the performance and service life of the joints by providing a hard support surface for the stud ball.

26. Being the first in the industry to develop a press-in cover plate closure method, and recognizing that the manufacturing innovation could be realized at a lower cost, the company pursued patent protection for its new pioneering cover plate expansion method of manufacture.

27. The '280 Patent was applied for in October of 1998.

28. The '280 Patent ultimately issued after full and fair examination on March 20, 2001.

29. Federal-Mogul successfully uses the patented method on its MOOG® product line. *See, e.g.*, Exhibit 6, MOOG Bulletin 27018-R.

30. The improved press-in cover plate method of assembly and manufacture had an immediate and direct impact on the market. Prior customer complaints commonly associated with the old ball joint design concerning unacceptable noise and service life issues were greatly reduced with the introduction of the new and innovative MOOG® joints.

C. **Mevotech's Unlawful Infringement**

31. On information and belief, Mevotech designs, inspects, produces, imports, markets, offers for sale and sells automotive aftermarket parts, including control arms, ball joints, tie rods, idler arms, bearings and hub assemblies.

32. Mevotech touts itself out as "Engineering Company" and advertises its products as being "Engineered in Canada" by Mevotech engineers. Mevotech PowerPoint, at p. 3, 11, attached as **Exhibit 7**.

33. Mevotech's products are packaged in boxes and materials printed in Canada (based on indications on the boxes themselves), evidencing Mevotech's direct control in the packaging and importation of the goods.

34. Mevotech also promotes itself as having a 23 person strong quality control team that oversees every step of the manufacturing process, including, for example, drawing verification, inspection sheets, control plans, process control, and part inspection. *See* Exhibit 7 at p. 14.

35. Mevotech holds itself out as a company of highly-qualified engineering experts that are to be trusted and explicitly promotes its products as being "Engineered in Canada":

> Mevotech takes design seriously and is constantly evolving our products to make them function better and make your job easier. All **Mevotech parts are Engineered in Canada and designed in-house** in our North America headquarters. With Mevotech you'll

> never get reboxed parts from other manufacturers – you'll just get the best, original Mevotech parts.

*See* http://www.mevotech.com/why-industry-chooses-mevotech/, attached as **Exhibit 8** (emphasis in original); http://www.mevotech.com/product/engineered-in-canada/, attached as **Exhibit 9**; ("Mevotech has been designing and testing the best parts in Canada for 30 years. While other manufacturers may go overseas, Mevotech's researched quality and precision are something we want to see done right here at home."); Mevotech Q&A, *available at* http://www.whychoosemevotech.com/faq.html, attached as **Exhibit 10** ("Q: Who designs the parts for Mevotech? A: All Mevotech parts are designed in-house in North America. Q: Are Mevotech parts reboxed from another manufacturer? A: No, Mevotech designs and produces its own parts.").

36. On information and belief, Mevotech, without authority, imports into the United States, offers to sell, sells, and uses within the United States various aftermarket automotive parts, including, but not limited to, ball joints and other chassis components that include ball joints that are made by a process protected by the '280 Patent, including control arms, tie rod ends and steering knuckles for automotive steering and suspension systems, including but not limited to the following exemplary Mevotech part numbers: MES80574, MK5333, MS25503, MS25619, and CMS25142, each of which is available for purchase in the United States.

37. Mevotech imports the infringing products into and ships them throughout North America, including the United States and Michigan, for sale.

38. Mevotech maintains a sales force in the United States, including in Michigan, to promote and sell its imported infringing products. *See* Exhibits 2-5.

39. Mevotech touts itself as having "22 Manufacturing facility partnerships World-wide." *See* Exhibit 7 at p. 5.

40. The packaging on Mevotech's products states that the products are from China. *See* **Exhibit 11.**

41. Upon information and belief, Mevotech contracts with its Chinese manufacturers to manufacture the allegedly infringing products.

42. Upon information and belief, Mevotech directs or controls the performance of its Chinese manufacturers with respect to the manufacture of the infringing products.

43. Upon information and belief, Mevotech has formed a joint enterprise with its Chinese manufacturers with respect to such manufacture and/or conditions participation in an activity or receipt of a benefit by its Chinese manufacturers upon performance of a step or steps of the patented method and establishes the manner or timing of that performance.

44. Visible inspection of Accused Products shows that they include sockets, the housings of which contain central bores including open ends having

counterbore and circumferential grooves formed along the counterbores. Visible inspection of the Accused Products further shows that sockets of the Accused Products include various joint components, including studs, which were inserted into the central bore.

45. Mevotech's own printed publications show that the pre-assembled cover plate has an expandable conical shape prior to pressing. *See* Exhibit 7.

46. Physical markings on the top surface of the cover plate element of exemplary accused product confirm that after seating the cover plate element was engaged by and pressed with a ram. Similarly, radially extending scratch marks on the bottom surface of the cover element confirm that after seating the cover element was engaged and pressed into position enclosing the housing. In addition, scraping away of the gold plating on the bottom surface of the cover element confirms the cover element was engaged and pressed into position to enclose the housing. Also, the outer peripheral edge of the cover-element is pressed against the wall of the circumferential groove showing that the cover element was pressed into position enclosing the housing.

## COUNT I

### PATENT INFRINGEMENT - 35 U.S.C. § 271(g)

47. Federal-Mogul incorporates paragraphs 1 through 46 as if fully set forth herein.

48. The '280 Patent was duly and legally issued by the United States Patent and Trademark Office.

49. The '280 patent is valid and enforceable.

50. Federal-Mogul owns the '280 Patent by assignment.

51. Mevotech has directly infringed and continues to infringe, directly and/or indirectly the '280 Patent by, without authority, importing into the United States and offering to sell, selling, and using within the United States automotive chassis products that include ball joints that are made by a process protected by one or more claims of the '280 Patent.

52. Those automotive chassis products that are made by a process protected by one or more claims of the '280 Patent are neither materially changed by a subsequent process nor do they become trivial or non-essential components of another product. Accused automotive chassis parts include at least MES80574, MK5333, MS25503, MS25619 and CMS25142.

53. Federal-Mogul is entitled to damages under 35 U.S.C. § 284 by virtue of Mevotech's infringement of the '280 Patent. In addition, Federal-Mogul is entitled to enhanced damages as Mevotech was made aware of its infringing activities at least as early as September 10, 2015, and has refused to halt its wrongful conduct.

## RELIEF REQUESTED

WHEREFORE, Federal-Mogul respectfully requests that the Court enter judgment in favor of Federal-Mogul on Federal-Mogul's claims for patent infringement and (1) order, adjudge and decree that Mevotech has infringed the '280 Patent in violation of 35 U.S.C. § 271(g); (2) order, adjudge, and decree that Mevotech willfully and knowingly infringed the '280 Patent; (3) order, adjudge and decree that this case is exceptional under 35 U.S.C. § 285; (4) issue injunctive relief prohibiting Mevotech, its respective parents, subsidiaries, principal, officers, agents, affiliates, servants, attorneys, employees, and all others in privity with it from infringing the '280 patent; (5) award Federal-Mogul damages for patent infringement including prejudgment interest and costs against Mevotech under 35 U.S.C. § 284; (6) award Federal-Mogul increased damages under 35 U.S.C. § 284; (7) award Federal-Mogul its reasonable attorneys' fees under 35 U.S.C. § 285; and (8) award such other and further relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff Federal-Mogul Motorparts Corporation demands a trial by jury as to all issues so triable.

            Respectfully submitted,

            /s/ Edward H. Pappas
            DICKINSON WRIGHT PLLC

            Edward H. Pappas (P23324)
            2600 W. Big Beaver Rd., Suite 300
            Troy, Michigan 48084
            Tel: 248.433.7200
            Fax: 248.433.7274
            epappas@dickinsonwright.com

            H. Jonathan Redway (Va. Bar No. 42189)
            DICKINSON WRIGHT PLLC
            1875 Eye St., N.W., Suite 1200
            Washington, D.C. 20006
            Tel: 202.659.6946
            Fax: 202.659.1559
            jredway@dickinsonwright.com

            Michelle L. Alamo (P60684)
            Salina M. Hamilton (P75296)
            DICKINSON WRIGHT PLLC
            500 Woodward Ave, Suite 4000
            Detroit, Michigan 48226
            Tel: 313.223.3500
            Fax: 313.223.3598
            malamo@dickinsonwright.com
            shamilton@dickinsonwright.com

Dated: November 25, 2015

DC 710240-7754 266252v2